Filed 5/17/16  Joyce v. Volt Management Corp. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JUAN CARLO JOYCE, | D067867 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2014-00036844-CU-WT-CTL) |
| VOLT MANAGEMENT CORP. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County,

Katherine A. Bacal, Judge.  Affirmed.

Paul, Plevin, Sullivan & Connaughton, Aaron A. Buckley, Corrie J. Klekowski

and Michael J. Etchepare for Defendant and Appellant Volt Management Corp.

Seyfarth Shaw, Colleen M. Regan, Kiran A. Seldon and Jennifer L. Gentin for

Defendants and Appellants Solar Turbines Incorporated and Greg Robertson.

The Ahrens Law Office, Kimberly A. Ahrens; Law Office of Johanna S.

Schiavoni and Johanna S. Schiavoni for Plaintiff and Respondent.

I.

INTRODUCTION

Juan Carlo Joyce filed a complaint against Volt Management Corp. (Volt), Solar Turbines Incorporated (Solar), and Greg Robertson (collectively "appellants"), alleging workplace harassment based on sexual orientation, among other causes of action. Appellants filed a petition to compel arbitration. The trial court denied the petition on the ground that appellants had not established that Joyce manifested his assent to be bound by a valid arbitration agreement.

On appeal, appellants claim that the trial court erred in denying the petition, providing three arguments in support of this claim. First, appellants contend that Joyce assented to an arbitration agreement by signing an employment agreement with Volt that contained an arbitration provision. We conclude that the trial court did not err in finding that appellants failed to establish that Joyce signed the employment agreement. Appellants also claim that Joyce assented to an arbitration agreement by signing an acknowledgement attesting to his receipt and review of an employee handbook that contained an arbitration agreement. We conclude that the trial court properly determined that the arbitration agreement in the employee handbook was not enforceable because it was expressly superseded by a separate employee orientation guide. Finally, citing *Craig v. Brown & Root, Inc.* (2000) 84 Cal.App.4th 416, 420 (*Craig*), appellants claim that Joyce implicitly assented to an arbitration agreement by continuing to work at Volt after becoming aware of the existence of Volt's arbitration agreement. We reject this argument, based on two cases that have concluded that *Craig* is "inapposite" where, as in

2

this case, the agreement that contains the arbitration provision requires that the employee sign the agreement in order for it to be effective. (*Mitri v. Arnel Management Co.* (2007) 157 Cal.App.4th 1164, 1172 (*Mitri*); see *Gorlach v. Sports Club Co.* (2012) 209 Cal.App.4th 1497, 1509 (*Gorlach*).) Accordingly, we affirm the trial court's order denying appellants' petition to compel arbitration.[1]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Joyce's complaint*

In October 2014, Joyce filed a complaint that contained the following allegations. Joyce is a gay man and is in a same sex marriage. In June 2012, Volt hired him to work as a temporary employee assigned to work for Solar.[2] Joyce married his longtime partner on July 10, 2013. Shortly thereafter, Joyce revealed his sexual orientation and same-sex marital status to Robertson, his direct supervisor.

In the wake of these revelations, Joyce was "subjected to consistent, unwelcome, harassing, inappropriate and derogatory comments regarding [his] sexual orientation . . . ." Robertson engaged in several discriminatory acts against Joyce based on his sexual orientation including: denying him employment opportunities, issuing

---

[1]  In light of our affirmance of the trial court's order on these grounds, we need not consider the numerous alternative arguments for affirmance that Joyce offers in his brief.

[2]  Although Joyce's complaint alleged that "defendants" hired him, Joyce stated in a declaration that he worked for Volt beginning in 2012, that Volt is a "temporary staffing and recruiting agency that hires employees on an assignment basis," and that he had worked for Solar on assignment from Volt.

3

unwarranted negative performance appraisals, and referring to Joyce in a "hostile, insulting, and aggressive manner . . . ."

As a result of this conduct, Joyce sought out other employment opportunities that did not require Robertson's oversight. In early February 2014, Joyce accepted an offer with Solar to work as an engineer under a different manager. Solar instructed Joyce to resign from his position with Volt. Joyce submitted his resignation to Volt on or about February 10, but continued working until February 26.

On February 25, a fellow employee reported to Joyce that her manager had made sexually harassing comments to her. Joyce reported the manager's conduct to a regional manager because he reasonably believed that such conduct was illegal and violated company policies. On February 28, Solar terminated Joyce's employment.

Joyce 's complaint contained seven causes of action: harassment based on sexual orientation and intentional infliction of emotional distress (against all defendants); discrimination based on sexual orientation, and failure to prevent harassment, discrimination and/or retaliation (against Volt and Solar); and retaliation, wrongful termination, and negligent training and supervision (against Solar).

B.    *Appellants' petition to compel arbitration*

Appellants filed a petition to compel arbitration pursuant to Code of Civil Procedure section 1281.2 (Section 1281.2).[3] In a supporting brief, appellants stated that Volt is a contingent staffing provider that has a contract with Solar to provide temporary

---

[3]    Volt filed the petition, and Solar and Robertson joined in the petition.

4

staffing.  Appellants contended that on May 21, 2012, Joyce signed a one-page

employment agreement (Employment Agreement) with Volt that contained an arbitration

provision (Employment Agreement Arbitration Provision) that provides as follows:

> "AGREEMENT TO ARBITRATE DISPUTES:  Any disputes
> arising out of or relating to the actions of Volt or any assignments or
> termination of any assignment, and/or disputes arising out of or
> related to the actions of Volt's Clients (or Clients' employees), shall
> be settled by final and binding arbitration, pursuant to the Federal
> Arbitration Act, in accordance with the rules of the American
> Arbitration Association (www.adr.org), in the state where you were
> employed.  The arbitrator may award attorney fees and/or costs to
> the prevailing party, in accordance with the law.  Judgment upon the
> arbitration award may be entered in any court having jurisdiction.
> Volt and you hereby waive our respective rights to trial by jury and
> any cause of action or defense that we may have against each other
> or against any Client of Volt.  This agreement to arbitrate disputes
> does not prevent you from filing a charge or claim with any
> governmental administrative agency as permitted by applicable law."
> (Boldface omitted.)

Appellants also stated that, at the time he was hired, Joyce signed an

acknowledgment verifying his receipt of an employee handbook (Employee Handbook)

containing an arbitration provision (Handbook Arbitration Provision) that is substantially

similar to the Employment Agreement Arbitration Provision.

Appellants contended that Joyce and Volt "entered into a valid, binding, and

mutual arbitration provision contained in both the one-page Employment Agreement and

the Employee Handbook."  Appellants further argued that an employee may manifest his

assent to an arbitration agreement by way of "continued employment."  Appellants

argued:

> "Joyce signed the Employment Agreement confirming that he read
> and agreed to be bound by the arbitration provision.  [Citations.]

5

Joyce then continued his employment until his resignation in February 2014. [Citation.] These facts satisfy the offer, acceptance, and consideration requirements for contract formation." (Fn. omitted.)

Appellants argued that Solar and Robertson could enforce the arbitration provision as third-party beneficiaries of the Employment Agreement Arbitration Provision and the Handbook Arbitration Provision.

In support of the petition, Volt lodged several exhibits, including a copy of the Employment Agreement (Def. Exhibit 1), a copy of the Employee Handbook, and a copy of Joyce's signed Employee Handbook acknowledgement form.

Volt also lodged a declaration from its director of human resources, Kendra Bellman. Bellman stated that she had reviewed Joyce's personnel file, which was maintained in the regular scope of Volt's business. Bellman further stated:

> "Volt hired Joyce to work as a Controls Manufacturing Engineer on assignment to Solar in June 2012. It is Volt's policy, practice and procedure to have all employees complete and execute an Employment Agreement upon hiring. The Employment Agreement contains an arbitration provision in paragraph 8. . . .[4]

> "5. On May 21, 2012, Joyce . . . signed an acknowledgment verifying his receipt of the Volt Employee Handbook."

---

4      We omit that portion of Bellman's declaration in which she stated that "Joyce signed the one-page Employment Agreement containing the arbitration provision on May 21, 2012." The trial court sustained Joyce's objection to that portion of the declaration on the ground that Bellman lacked personal knowledge of this fact, and Volt raises no claim as to this evidentiary ruling on appeal.

6

C.    *Joyce's ex parte application*

Prior to filing an opposition to the petition, Joyce filed an ex parte application seeking an order permitting Joyce to depose Casey Wood, the individual who signed the Employment Agreement on behalf of Volt, and permitting Joyce to depose Volt's person most qualified concerning the existence of any arbitration agreements between Joyce and Volt.  In a brief in support of the application, Joyce argued that he "dispute[d] the existence of any arbitration agreement covering his claims . . . ."

Volt filed an opposition to Joyce's application.  Volt argued that its filing of a petition to compel arbitration mandated a stay of all proceedings in the litigation pending a decision on the petition.  In addition, Volt argued that Joyce had not demonstrated good cause justifying the taking of the depositions.  In support of this contention, Volt argued Joyce "does not state that he intends to make any argument that he did not actually sign the agreement."

After a hearing, the trial court denied Joyce's application without prejudice.

D.    *Joyce's opposition*

Joyce filed an opposition to the petition to compel in which he argued that appellants failed to meet their burden of establishing the existence of a binding and enforceable arbitration agreement.  Joyce stated that he disputed signing the Employment

7

Agreement, and contended that he had "never seen the Employment Agreement," until the commencement of this litigation.[5]

In support of his contention that he had not signed the Employment Agreement, Joyce argued that he requested his personnel file in March 2014 and that the Employment Agreement was not provided to him at that time. Joyce also maintained that, although his counsel had requested his personnel file in June 2014, Volt did not produce the Employment Agreement until November 2014, after the filing of this lawsuit. In addition, Joyce noted that Volt failed to submit an affidavit from Wood and had refused to produce Wood for a deposition, despite the fact that the Employment Agreement bore her signature. Joyce also argued that Wood had not been assigned to be Joyce's representative for any portion of his employment with Volt and Joyce did not recall having signed any documents in her presence. Finally, Joyce maintained that there were a number of "inconsistencies and irregularities," with respect to the Employment Agreement that appellants offered in support of their petition, including that information on the form pertaining to his job title and supervisor was incorrect.

With respect to the Employee Handbook, Joyce acknowledged that he had signed an acknowledgement form attesting to his receipt of the handbook, but contended that he did "not receive the actual handbook referenced in the Acknowledgment." Joyce argued further that, even assuming he had received the Employee Handbook, this handbook had been superseded by an orientation guide, the Volt On-Site at Solar Turbines New

---

[5]     Joyce also stated that he had not signed a separate arbitration agreement contained in Volt's employment application agreement (Employment Application).

8

Employee Orientation Guide (Orientation Guide), which stated, "I understand that this [Orientation Guide] supersedes any prior handbooks or policy manuals issued by [Volt] . . . ."  (Italics omitted.)  Thus, Joyce argued that the Handbook Arbitration Provision was not an enforceable arbitration agreement.

Joyce lodged his own declaration as well as a declaration from his counsel. Among other statements supporting the claims made in his opposition, Joyce stated the following in his declaration:

> "I received, but do not recall signing, Volt's arbitration agreement contained in the application documents I initially submitted to Volt. . . .
>
> "8. After the instant motion was filed by [appellants], I reviewed 'Defendant's Exhibit 1 - Employment Agreement.'  I had never seen Defendant's Exhibit 1 - Employment Agreement until after I filed the instant lawsuit."

With respect to the Employee Handbook, Joyce admitting having signed an acknowledgment form attesting to his receipt of the handbook, but contended that he had not actually received the handbook.  Joyce also stated the following:

> "Even if I had received the May 21, 2012 [Employee Handbook], Volt and Solar subsequently issued an entirely different [h]andbook to me on June 4, 2012 [(Orientation Guide)] that expressly supersedes any prior handbook."

Joyce also lodged several documents in opposition to the petition, including the unsigned Employment Application that contained an arbitration agreement (Employment Application Arbitration Agreement) and the Orientation Guide referred to in his declaration and opposition.

9

E.    *Appellants' replies*

Volt filed a reply in which it argued that Joyce had signed the Employment Agreement that contained an arbitration provision. Volt argued that the signed Employment Agreement had been found in Joyce's personnel file and urged the trial court to compare the signature on the Employment Agreement with an admitted signature of Joyce's. Volt also argued that Joyce "does not dispute the signature is his." (Italics omitted.) In addition, Volt argued that Joyce had admitted that he had signed an acknowledgement of the Employee Handbook, and noted that the acknowledgement stated, " 'I agree to arbitrate any and all disputes related to my employment or assignment(s) with Volt, as discussed in this [Employee Handbook].' " Volt further contended that the Orientation Guide did not "[r]escind[ ]" the prior Employee Handbook because the two documents "served distinct functions," and that it would be "illogical" to interpret the Orientation Guide as replacing policies outlined in the Employee Handbook.

Volt further contended that Joyce's arguments suggesting that the Employment Agreement had been altered were misleading. In particular, Volt argued that it was "irrelevant" that the Employment Agreement may have contained some "collateral details" that were inaccurate. Volt also argued that Joyce had assented to arbitration because he "admit[ted] . . . receiv[ing] Volt's arbitration policy when he applied at Volt and that he then accepted and continued his employment with Volt for two years."

Solar and Robertson filed a separate reply in which they raised arguments not relevant to the issues addressed in this opinion.

10

F.     *The trial court's order denying the petition*

After hearing argument, the trial court entered an order denying the petition.  The

court reasoned in relevant part:

> "[Appellants] submit an Employment Agreement dated May 21,
> 2012 that contains [Joyce's] signature.  [Citation.]  The Employment
> Agreement requires binding arbitration . . . .  [¶] . . . [¶]  [Joyce]
> denies ever seeing the Employment Agreement until after he filed
> this lawsuit.  [Citation.]  [Appellants] bear the burden of proving the
> existence of a valid arbitration agreement by a preponderance of the
> evidence.  [Citation.]  [Joyce] has raised significant questions
> regarding the document's authenticity.  When he was hired, [Joyce]
> received but did not sign a different document that contained an
> arbitration provision.  [Citation.]  [Joyce] requested his personnel
> file a few days after his termination but he was not given the signed
> Employment Agreement.  [Citation.]  [Joyce's] counsel was not
> provided the signed agreement until mid-November 2014.
> [Citation.]  The Employment Agreement references a job that
> [Joyce] was never assigned to, and he does not recall the
> representative who allegedly signed on behalf of Volt (Casey
> Wood).  [Citation.]  When [Joyce] sought to obtain more
> information regarding the agreement, [appellants] refused to allow
> [Joyce] to depose Wood.  [Citation.]
>
> "[Appellants] also rely on an arbitration provision in the [Employee
> Handbook].  [Joyce] signed an Acknowledgment stating he received
> and reviewed the [Employee Handbook].  [Citations.]  The
> Acknowledgment requires arbitration 'as discussed in this
> [Employee Handbook].'  However, [Joyce] never received the
> [Employee Handbook].  [Citation.]  He did, however, receive [the
> Orientation Guide] at an orientation on June 4, 2012.  [Citations.]
> The Orientation Guide supersedes 'any prior handbooks or policy
> manuals' issued by Volt and may be 'updated and/or changed by Volt
> at any time.'  [Citation.]  The Orientation Guide is addressed to all
> Volt employees who work for Volt nationwide.  [Citation.]  The
> Orientation Guide does not discuss arbitration.  For the purposes of
> this motion, [Joyce] has proven by a preponderance of the evidence
> that the [Employee Handbook], was superseded by the Orientation
> Guide, which does not require arbitration.

11

"For all these reasons, [appellants] have not established that [Joyce] is bound by a valid arbitration agreement."

G.    *Appellants' appeal*

Appellants timely appeal the trial court's order denying their petition to compel arbitration.  The order is appealable.  (Code Civ. Proc., § 1294, subd. (a).)

III.

DISCUSSION

*The trial court did not err in determining that Joyce had not manifested his assent to be bound by a valid arbitration agreement*

Appellants contend that the trial court erred in determining that they failed to establish that Joyce had manifested his assent to be bound by a valid arbitration agreement.  We first outline the general principles of law governing the enforceability of an arbitration provision, and then address each of the three arguments that appellants advance in support of their claim that the trial court erred in denying their petition to compel arbitration.

A.    *General principles of law governing the enforceability of an arbitration provision*

Section 1281.2 provides in relevant part, "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . ."

12

In *Ramos v. Westlake Services LLC* (2015) 242 Cal.App.4th 674 (*Ramos*), the court outlined the law that a trial court is to apply when presented with a petition to compel arbitration pursuant to Section 1281.2:

> "[T]he court's first task is to determine whether the parties have entered into an agreement to arbitrate their claims. [Citation.] Courts 'apply general California contract law to determine whether the parties formed a valid agreement to arbitrate their dispute.' [Citation.] 'General contract law principles include that "[t]he basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contract[ ]." ' [Citation.] 'Contract law also requires the parties agree to the same thing in the same sense.' [Citation.] 'The petitioner [seeking arbitration] bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence, while a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. [Citation.] The trial court sits as the trier of fact, weighing all the affidavits, declarations, and other documentary evidence, and any oral testimony the court may receive at its discretion, to reach a final determination.' " (*Ramos*, *supra*, at pp. 685-686.)

Appellants contend that a trial court must apply the strong public policy in favor of arbitration embodied in the Federal Arbitration Act (9 U.S.C. § 1) (FAA)[6] in determining the threshold question of whether the parties entered into an arbitration agreement. Appellants are correct that there are California cases that state "where a transaction falls under the FAA, even the threshold decision of whether there is an agreement to arbitrate 'must be made " 'with a healthy regard for the federal policy favoring arbitration.' " ' " (*Erickson v. Aetna Health Plans of California, Inc.* (1999) 71 Cal.App.4th 646, 655; see,

---

6     Appellants contend that the FAA applies in this case because "Volt is a multinational corporation engaged in interstate commerce, with employees in every U.S. state."

e.g., *City of Vista v. Sutro & Co.* (1997) 52 Cal.App.4th 401, 407.)  More recent cases have concluded that the "federal policy in favor of arbitration does not come into play, however, until a court has found the parties entered into a valid contract under state law." (*Metters v. Ralphs Grocery Co.* (2008) 161 Cal.App.4th 696, 701.)

The United States Supreme Court has now clarified that "the presumption [in favor of arbitration] does *not* apply to disputes concerning whether an agreement to arbitrate has been made."  (*Applied Energetics, Inc. v. NewOak Capital Markets, LLC* (2d Cir. 2011) 645 F.3d 522, 526 (italics added), citing *Granite Rock Co. v. International Broth. of Teamsters* (2010) 561 U.S. 287, 301 (*Granite Rock*).)  In *Granite Rock*, the Supreme Court held that the federal policy favoring arbitration applies "only *where a validly formed and enforceable arbitration agreement* is ambiguous about whether it covers the dispute at hand . . . ."  (*Granite Rock*, at pp. 301, italics added, 302 ["we have never held that this policy [in favor of arbitration] overrides the principle that a court may submit to arbitration 'only those disputes . . . that the parties have agreed to submit' "].)

B.    *The trial court did not err in determining that appellants failed to establish that Joyce signed the Employment Agreement*

Appellants claim that the trial court erred in determining that they had not demonstrated that Joyce manifested his assent to an arbitration agreement by signing the Employment Agreement.  Appellants raise three distinct arguments in support of this claim, which we consider in turn.

14

1. *The trial court did not fail to properly apply evidentiary rules for authenticating a writing*

Appellants claim that the "trial court failed to apply the proper authentication standard" (boldface & capitalization omitted) in concluding that they had not established that Joyce signed the Employment Agreement. This contention raises a question of law that we review de novo. (See *Apex LLC v. Sharing World, Inc.* (2012) 206 Cal.App.4th 999, 1009 [review of a trial court's "selection of the applicable law . . . is reviewed de novo"].)

Appellants note that a writing may be authenticated by any qualified witness and that a handwriting comparison done by the court is a valid form of authentication.[7] Appellants contend that the trial court "failed to apply" these standards pertaining to the

---

[7] Citing *Condee v. Longwood* (2001) 88 Cal.App.4th 215, 219 (*Condee*), appellants also assert that a party petitioning to compel arbitration "need only prove an agreement's existence, at which point the burden shifts to [the respondent] to prove the agreement's falsity." We agree with the court in *Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 846, that, "[p]roperly understood, *Condee* holds that a petitioner is not required to authenticate an opposing party's signature on an arbitration agreement *as a preliminary matter* in moving for arbitration *or* in the event the authenticity of the signature is not challenged." In this case, Joyce clearly challenged the authenticity of his signature in his opposition; *Condee* therefore does not apply and appellants bore the burden of establishing the existence of a valid agreement to arbitrate. (See *Espejo v. Southern California Permanente Medical Group* (Apr. 22, 2016, B262717) ___ Cal.App.4th ___ [2016 Cal.App. Lexis 316, p. *22] [discussing *Condee* and *Ruiz* and stating that "[o]nce [party opposing petition to compel arbitration] challenged the validity of that signature in his opposition, defendants were then required to establish by a preponderance of the evidence that the signature was authentic"]; see also *Toal v. Tardif* (2009) 178 Cal.App.4th 1208, 1219-1220 & fn.8 [stating that in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394 "[O]ur Supreme Court has clearly stated that a court, before granting a petition to compel arbitration, *must* determine the factual issue of 'the existence or validity of the arbitration agreement,' " and that to "the extent *Condee* conflicts with *Rosenthal,* our Supreme Court's decision is controlling"].)

15

law governing the authentication of a writing.  This argument is unpersuasive because there is *no* evidence in the record demonstrating that the trial court failed to consider such methods of authentication.[8]  While appellants argue that the trial court's order did not discuss evidence that appellants contend demonstrates that the Employment Agreement was properly authenticated, the trial court *did* refer to the primary piece of evidence offered by appellants—the Employment Agreement—stating, "[Appellants] submit an Employment Agreement dated May 21, 2012 that contains [Joyce's] signature." However, the trial court also stated that Joyce had "raised significant questions regarding the document's authenticity."  Further, the trial court's order provided a detailed description of the evidence that it relied on in determining that appellants failed to establish that Joyce in fact signed the Employment Agreement.  (See pt. II.F., *ante*.)  In any event, the fact that the trial court did not "discuss[ ]" all of the appellants' evidence clearly does not establish that the trial court applied an incorrect legal standard.

Accordingly, we conclude that the trial court did not "fail[ ] to apply the proper authentication standard" (boldface & capitalization omitted) in determining the authenticity of the Employment Agreement.

---

[8]    The methods of authentication mentioned in appellants' brief are far from the only manner by which a writing may be authenticated.  (See, e.g., Evid. Code § 1414 [writing may be authenticated by an admission]; Evid. Code § 1416 [writing may be authenticated by a witness with personal knowledge of the supposed writer's handwriting]; Evid. Code § 1418 [writing may be authenticated by a handwriting comparison made by an expert witness].)

2.      *Appellants' assertion that undisputed evidence in the record establishes that Joyce signed the Employment Agreement is incorrect*

Appellants also contend that "undisputed evidence proves Joyce signed the Employment Agreement."  (Boldface & capitalization omitted.)  As noted previously (see pt. II.D., *ante*), in his declaration Joyce stated:

> "After the instant motion was filed by [appellants], I reviewed 'Defendant's Exhibit 1 - Employment Agreement.'  *I had never seen Defendant's Exhibit 1 - Employment Agreement until after I filed the instant lawsuit*."  (Italics added.)

While appellants interpret Joyce's declaration as stating that Joyce denied "recalling 'seeing' *the fully-executed version of the Employment Agreement*" (italics added), that is not what Joyce's declaration says.  Joyce's declaration states that he had never seen the Employment Agreement prior to his filing of this lawsuit.  Further, in its order denying appellants' petition to compel, the trial court stated,"[Joyce] denies ever seeing the Employment Agreement until after he filed this lawsuit."  As the trier of fact, the trial court could reasonably find that Joyce's declaration constituted evidence disputing that he had signed the Employment Agreement.  Thus, while appellants contend that "Joyce's carefully worded declaration does not actually dispute that the signature on the Employment Agreement was his," the trial court was not required to accept appellants' interpretation of any ambiguity in Joyce's declaration.  In addition, as discussed below, Joyce presented evidence, which the trial court credited, that supported a finding that Joyce had not signed the Employment Agreement.  Thus, we reject appellants' contention that the "undisputed evidence" (boldface & capitalization omitted) established that Joyce signed the Employment Agreement.

17

3. *There is substantial evidence to support the trial court's finding that appellants failed to establish that Joyce manifested his assent to be bound by a valid arbitration agreement by signing the Employment Agreement*

Appellants contend that the record lacks substantial evidence to support the trial court's finding that they did not establish that Joyce had manifested his assent to be bound by a valid arbitration agreement by signing the Employment Agreement.

Substantial evidence is evidence that a reasonable person "might accept as adequate to support a conclusion," (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644), or evidence "that is reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) If there is substantial evidence that supports a disputed finding, a reviewing court must uphold the finding "no matter how slight it may appear in comparison with the contradictory evidence . . . ." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631; see also *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 (*Shamblin*) ["Even though contrary findings *could* have been made, an appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict. This is true whether the trial court's ruling is based on oral testimony or declarations"].)

As discussed above, Joyce submitted a declaration stating that he had never *seen* the Employment Agreement until after he filed this action. From such declaration the trial court could plainly infer that Joyce had not *signed* the Employment Agreement. (See *Carlson v. Home Team Pest Defense, Inc.* (2015) 239 Cal.App.4th 619, 630 [in conducting substantial evidence review on review from order denying motion to compel arbitration, reviewing court must "presume the [trial] court . . . drew every permissible

18

inference necessary to support its judgment"].)  Thus, Joyce's declaration, by itself, constitutes substantial evidence to support the trial court's finding that appellants failed to establish that Joyce manifested his assent to be bound by a valid arbitration agreement by signing the Employment Agreement.  (See *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [testimony of a single witness may suffice to constitute substantial evidence].)

Further, the trial court referred to six other facts that it found "raised significant questions regarding the [Employment Agreement's] authenticity," including that the Employment Agreement had not been timely provided to Joyce or his counsel in response to requests for his personnel file.  (See pt II.F., *ante*.)  We reject appellants' assertion in their brief that "the evidence that Joyce *did* sign the Employment Agreement is overwhelming."  While appellants contend that the signature on the Employment Agreement is "substantially similar" to a known signature of Joyce's, the trial court was not *required* to find that Joyce had signed the Employment Agreement based on such comparison.  In addition, appellants did not provide a declaration from Wood (the person who purportedly signed the Employment Agreement on Volt's behalf), did not provide a declaration from any employee who either witnessed Joyce sign the Employment Agreement or received the signed Employment Agreement from him, and did not provide a declaration from a handwriting expert attesting that the signature on the Employment Agreement was Joyce's.  While appellants were not required to provide such evidence in order to prevail on their petition to compel, the absence of such evidence, when considered in connection with the evidence offered by Joyce in opposition to the petition

19

to compel, demonstrates that the evidence before the trial court that Joyce had signed the Employment Agreement was far from overwhelming.

Accordingly, although a "contrary finding[ ] *could* have been made" (*Shamblin*, *supra*, 44 Cal.3d at p. 479), we conclude that there is substantial evidence to support the trial court's finding that appellants failed to establish that Joyce signed the Employment Agreement.

C.     *The trial court did not err in concluding that the Orientation Guide superseded the arbitration provision in the Employee Handbook*

Appellants contend that the trial court erred in concluding that the Orientation Guide "[n]ullified" the arbitration provision in the Employee Handbook.  Specifically, appellants claim that that the trial court erred in interpreting a provision of the Orientation Guide as providing that the Orientation Guide superseded the arbitration provision in the Employee Handbook.  We apply the de novo standard of review to this claim because it presents a question of contractual[9] interpretation that does not turn on the credibility of extrinsic evidence.  (See *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 520 [the " 'interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence' "].)

---

9      In their brief, appellants discuss law governing when "[a] statement that a present *contract* version supersedes all previous or alternate versions . . . ."  (Italics added.)  We assume for purposes of this decision that appellants are correct that both the Orientation Guide and the Employee Handbook are contracts.

1. *Factual and procedural background*

As noted in part II.D., *ante*, Joyce acknowledged that, on May 21, 2012, he signed an acknowledgement form attesting to his receipt of the Employee Handbook. The acknowledgement form stated in relevant part, "Except as otherwise stated, I agree to arbitrate any and all disputes related to my employment or assignment(s) with Volt, as discussed in this [Employee Handbook]."

Joyce presented undisputed evidence that, on June 4, 2012, Volt and Solar issued the Orientation Guide to him and that he signed a form acknowledging receipt of the Orientation Guide that same day. The acknowledgement form from the Orientation Guide states in relevant part, "I understand that this [Orientation Guide] supersedes any prior handbooks or policy manuals issued by [Volt] . . . ." (Italics omitted.)

2. *Governing law*

    a. *General rules of contract interpretation*

"[T]he ordinary rules of contract interpretation" are well established. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 608 (*Santisas*).) The *Santisas* court described these rules as follows:

> " 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' " (*Ibid.*)

21

b.     *Case law considering whether an arbitration agreement has been superseded by a subsequent agreement*

In *Jenks v. DLA Piper Rudnick Gray Cary U.S. LLP* (2015) 243 Cal.App.4th 1, 15-16 (*Jenks*), the court considered whether an agreement between an employee and his prior employer containing an arbitration provision had been superseded by a subsequent agreement.  In *Jenks*, an agreement related to the termination of the employee's employment (Termination Agreement) provided in relevant part, " 'This Agreement constitutes the entire agreement between the parties *with respect to the subject matter hereof and supersedes all prior negotiations and agreements*, whether written or oral . . . .' "  (*Id.* at p. 15.)  The *Jenks* court concluded that the Termination Agreement did not supersede an arbitration agreement contained in a prior agreement (Offer Letter).  In reaching this conclusion, the *Jenks* court reasoned:

> "We conclude this clause does not apply to the forum for resolution of disputes, as the Offer Letter does, and therefore does not cancel the Offer Letter's arbitration feature.
>
> "As [employer] observes, the integration clause is explicitly limited to 'the subject matter hereof,' namely, the terms of plaintiff's resignation.  The Termination Agreement does not mention arbitration at all, and contains no provisions regarding dispute resolution.  Consequently, the identified forum for dispute resolution remains arbitration based on the original Offer Letter."  (*Id.* at pp. 15-16.)  (Italics omitted.)

The *Jenks* court reviewed several cases in which courts had considered similar issues, including *Grey v. American Management Services* (2012) 204 Cal.App.4th 803 (*Grey*) and *Cione v. Foresters Equity Services, Inc.* (1997) 58 Cal.App.4th 625 (*Cione*). The *Jenks* court concluded that the breadth of the subsequent agreement's integration

22

provision was central in determining whether the arbitration provision in an earlier

agreement had been superseded:

> "*Grey* is distinguishable from the present case, and from *Cione,* in
> that the relevant contract at issue in *Grey* did not contain the limiting
> 'with respect to the subject matter of' language found in both the
> *Cione* . . . contract and the Termination Agreement here.  (Compare
> *Cione*, *supra*, 58 Cal.App.4th at p. 631 [' "This Agreement contains
> the entire understanding of the parties hereto *with respect to the
> subject matter contained herein*.  There are no restrictions, promises,
> representations, warranties, covenants or undertakings, other than
> those expressly set forth or referred to in this Agreement" ' (italics
> added)] with *Grey*, *supra*, 204 Cal.App.4th at p. 807 [' "This
> Agreement *is the entire agreement* between the parties in connection
> with Employee's employment with [employer], and supersedes all
> prior and contemporaneous discussions and understandings" ' (italics
> added)].)"  (*Jenks*, *supra*, 243 Cal.App.4th at p. 19.)

### 3.      *Application*

The Orientation Guide states in relevant part, "I understand that this [Orientation

Guide] supersedes any prior handbooks or policy manuals issued by [Volt] . . . ."  (Italics

omitted.)  The " 'clear and explicit' " meaning of this provision, interpreted in its

" 'ordinary and popular sense' " (*Santisas*, *supra*, 17 Cal.4th at p. 608), is that, as the trial

court concluded, the Orientation Guide supersedes all of the provisions of the Employee

Handbook, including the arbitration provision contained therein.

Appellants do not argue to the contrary.  Instead, they argue, "as in *Cione*, the

[Employee] Handbook and the . . . Orientation Guide are not inconsistent on arbitration

— the [Employee] Handbook requires arbitration and the Orientation Guide is silent on a

23

forum for disputes."[10]  This argument fails for two related reasons.  *Cione* is distinguishable because, as noted by the *Jenks* court, the integration clause at issue in that case stated that the later agreement constituted " ' "the entire understanding of the parties hereto *with respect to the subject matter contained herein*." ' "  (*Jenks*, *supra*, 243 Cal.App.4th at p. 19, quoting *Cione*, *supra*, 58 Cal.App.4th at p. 631.)  There is no such limiting language in the provision at issue in the Orientation Guide.  In a related vein, the arbitration provision at issue in *Cione* could be given effect because to do so would not be inconsistent with the integration clause.  (See *Cione*, at p. 639 [enforcing arbitration agreement in registration application form where "written employment agreement was reasonably susceptible to the meaning that it did not supersede the [registration application form]"].)  In contrast, in this case, giving effect to the arbitration agreement in the Employee Handbook would be wholly inconsistent with the broad provision in the Orientation Guide that states that the guide "supersedes any prior handbooks . . . issued by [Volt] . . . ."  (Italics omitted.)

Appellants also argue that it would be "illogical" to "read the . . .Orientation Guide

_____

10     Although not mentioned by the parties, the Orientation Guide is *not* entirely silent with respect to a forum for disputes.  In a section on sexual harassment, the Orientation Guide contains the following statement, "It is the right of any employee to make a complaint through any complaint procedure with Volt and its subsidiaries and divisions . . . .  Any employee may also file a complaint under Title VII of the Civil Rights Act of 1964, or any applicable law in the state in which such harassment takes place."

as superseding all policies in the [Employee] Handbook." In support of this contention, appellants maintain that the Employee Handbook includes several polices covering topics that are not covered in the Orientation Guide. However, we agree with Joyce that we may not "*ignore* the parties' express language" in the Orientation Guide so as to interpret the Orientation Guide as being limited to, as the appellants argue, the explanation of "specific rules and expectations unique to the assignment at Solar." Further, a review of the Orientation Guide demonstrates that it in fact touches on many of the topics that appellants contend are covered only by the Employee Handbook. For example, appellants note that the Employee Handbook contains information on "various employment benefits," "[p]rocedures and policies for when the employee is on assignment, including communication with Volt," and "[e]mployee rights to privacy, safety, security, and equal employment opportunity." The Orientation Guide has a section on "benefits," contains information on "the correct point of contact for any issues or concerns you may have while on assignment," and has provisions pertaining to e-mail privacy, "security policies," (formatting omitted) and policies related to sexual harassment.

Accordingly, we conclude that the trial court did not err in determining that the Orientation Guide superseded the arbitration provision in the Employee Handbook.

D.     *Joyce did not manifest his implied assent to an arbitration agreement by continuing his employment with Volt after learning of the existence of an arbitration agreement*

Appellants claim that the trial court erred in failing to find that Joyce implicitly manifested his assent to be bound by an arbitration agreement.[11] We assume for purposes of this decision that appellants are correct that "[b]ecause the trial court made no factual findings related to Joyce's continued employment (and because there is no dispute of fact with regard thereto), this point of law is reviewed . . . *de novo*."

1.     *Governing law*

In *Craig*, *supra*, 84 Cal.App.4th 416, an employer sent a memorandum to all employees that contained the following language:

> "The enclosed brochure explains the procedures as well as how the Dispute Resolution Program works as a whole.  Please take the time to read the material.  IT APPLIES TO YOU.  It will govern all future legal disputes between you and the Company that are related in any way to your employment."  (*Id.* at p. 419.)

The brochure also "explained the Program's four-step progression — from open access to management, to an informal conference, to mediation, to arbitration," and described the arbitration process.  (*Craig*, *supra*, 84 Cal.App.4th at p. 419.)  The trial court in *Craig* compelled arbitration based on the memorandum.  (*Id.* at pp. 418-419.)

---

[11]     In his respondent's brief, Joyce contends that appellants forfeited this issue by raising this argument for the first time in their reply brief in the trial court.  We disagree. In their petition to compel, appellants argued, "[b]oth acceptance [of an arbitration agreement] and consideration are shown by an employee's continued employment," and thereafter cited authority relevant to this contention.  By raising the contention and citing applicable authority, appellants adequately raised the issue in their petition to compel.

The *Craig* court rejected the employee's claim that there was insufficient evidence to prove the existence of an agreement to arbitrate. The *Craig* court noted that a party's acceptance of an agreement to arbitrate may be "implied-in-fact where, as here, the employee's continued employment constitutes her acceptance of an agreement proposed by her employer." (*Craig*, *supra*, 84 Cal.App.4th at p. 420.) The *Craig* court reasoned that there was sufficient evidence to support the finding that the employee had agreed to be bound by the Dispute Resolution Program, including its arbitration provision, because she had had received the memorandum in 1993 and 1994 and had continued to work for the employer until 1997. (*Id.* at p. 422.)

In *Mitri*, *supra*, 157 Cal.App.4th 1164, the court considered whether the *Craig* court's theory of implied-in-fact assent applied where the document containing the arbitration provision required the employee's signature in order to be effective. The *Mitri* court concluded that the *Craig* court's theory of implied assent could not be reasonably applied in such a circumstance:

> "Unlike the arbitration agreement provision in the Arnel Employee Handbook, the memorandum in [*Craig*] established in and of itself the employer's dispute resolution program, and did not include an express requirement that its employees sign an arbitration agreement. Therefore, [*Craig*] is inapposite.

> "Defendants also contend the signed arbitration agreement required by the arbitration agreement provision in the Arnel Employee Handbook was *impliedly* unnecessary to establish an arbitration agreement between Arnel and plaintiffs. However, such an interpretation of the arbitration agreement provision contradicts that same provision's *express* term requiring a signed agreement. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 . . . ['implied terms should never be read to vary express terms']; *Benach v. County of Los Angeles* (2007)

27

149 Cal.App.4th 836, 855, fn. 12 . . . [' "[i]t is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract" '].)" (*Id.* at pp. 1172-1173.)

Similarly, in *Gorlach*, *supra*, 209 Cal.App.4th 1497, the court concluded that *Craig* does not govern where the document containing the arbitration provision is not unilaterally imposed, but instead requires an employee's signature in order to become effective:

> "We do not agree that [*Craig*] governs the present case. In [*Craig*], the employee memorandum did not ask employees to sign an arbitration agreement; it simply informed them that any employment-related dispute would henceforth be subject to arbitration. The employee handbook in the present case is different: Rather than unilaterally imposing an arbitration requirement, the handbook told employees that, 'As a condition to employment, all Team Members must *sign* the Mutual Agreement to Arbitrate Claims . . . .' (Italics added.) In other words, the handbook told employees that they must sign the arbitration agreement, implying that it was not effective until (and unless) they did so. Because Gorlach never signed the arbitration agreement, we cannot imply the existence of such an agreement between the parties." (*Id.* at p. 1509.)

2.      *Factual and procedural background*

In their petition to compel arbitration, appellants suggested that Joyce manifested his assent to the Employment Agreement Arbitration Provision and the Handbook Arbitration Provision by continuing his employment after having become aware of each provision.

In his opposition, Joyce denied ever having seen the Employment Agreement Arbitration Provision prior to the commencement of this litigation and claimed that the Handbook Arbitration Provision had been superseded by the Orientation Guide. In his

28

declaration lodged with his opposition, Joyce acknowledged having received, but did not recall signing, the Employment Application Arbitration Provision. The Employment Application contains an arbitration provision identical to that contained in the Employment Agreement. (See pt. II.B., *ante*.) Near the bottom of the Employment Application, the document contains a space for the applicant's signature, under a line that states, "I/We have read and agree to the above employment terms and conditions." (Boldface & capitalization omitted.)

In its reply, Volt argued that "Joyce admits he received Volt's arbitration policy when he applied at Volt and that he then accepted and continued his employment with Volt for two years." Volt contended that Joyce's continued employment with Volt manifested his intent to be bound by Volt's arbitration policy.

The trial court did not address whether Joyce had assented to an arbitration provision by continuing his employment with Volt after becoming aware of the existence of such provision.

3.    *Application*

On appeal, appellants note that the Handbook Arbitration Provision states, "Your continued employment with Volt is your agreement to the above provision requiring arbitration of any and all employment/assignment disputes."[12] Appellants also note that

---

[12]    The arbitration provision in the Employment Application and the Employment Agreement do not contain such a provision.

29

Joyce admitted receiving and signing an Employee Handbook acknowledgement form. Appellants contend that Joyce manifested his assent to be bound by the Handbook Arbitration Provision by continuing his employment with Volt after executing such an acknowledgement.

This argument fails because we concluded in part III.C., *ante*, that the Employee Handbook was superseded by the Orientation Guide. Accordingly, even if Joyce did assent to the arbitration provision in the Employee Handbook, the Employee Handbook was superseded by the Orientation Guide.

Appellants also contend that Joyce admitted in his declaration that he " 'received' " the Employment Agreement and that Joyce recalled that the Employment Agreement contained an arbitration policy. Appellants misstate the record. Joyce stated in his declaration that he had *not* seen the Employment Agreement until after the commencement of this litigation (see pt. II.D., *ante*), and we have concluded that there is substantial evidence to support the trial court's finding that Joyce did not manifest his assent to be bound by the Employment Agreement. (See pt III.B., *ante*.) Thus, appellants have not established that Joyce impliedly agreed to the Employment Agreement Arbitration Provision.

Although not expressly referred to by appellants in their brief, we acknowledge that Joyce stated in his declaration that he had seen, but did not recall signing, the

30

Employment *Application*, which contains an arbitration provision.  However, as with the documents at issue in *Gorlach* and *Mitri*, the Employment Application expressly requires a party's signature in order to be effective.  (See *Gorlach*, *supra*, 209 Cal.App.4th at p. 1509; *Mitri*, *supra*, 157 Cal.App.4th at pp. 1172-1173.)  We agree with the *Gorlach* and *Mitri* courts that a party's assent to a document may not be implied under *Craig* where the document requires a party's signature in order to be effective.  (See *Gorlach*, at p. 1509 [distinguishing *Craig* and stating "the handbook told employees that they must sign the arbitration agreement, implying that it was not effective until (and unless) they did so"]; *Mitri*, at pp. 1172-1173 [same].)[13]

Accordingly, we conclude that Joyce did not manifest his implied assent to an arbitration agreement by continuing his employment with Volt after learning of the existence of an arbitration agreement.

---

[13]    *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223 (*Pinnacle*), upon which appellants relied in the trial court and on appeal, does not provide any additional support for appellants' claim beyond that provided in *Craig*.  The *Pinnacle* court merely cited to *Craig* for the generic proposition that "[a] signed agreement [to arbitrate] is not necessary . . . and a party's acceptance may be implied in fact," while outlining the general law governing the enforceability of arbitration agreements.  (*Id.* at p. 236.)  For the reasons stated in the text, *Craig* is distinguishable and Joyce's assent to an arbitration provision may not be implied under the circumstances of this case.

IV.

DISPOSITION

The order denying the petition to compel arbitration is affirmed.


                                                                    AARON, J.

I CONCUR:

PRAGER, J.*


I CONCUR IN THE RESULT:

HUFFMAN, Acting P. J.

---

*     Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.